GARRETT, J.
|/The defendants, Milton Crow Limited Partnership and Livingstone, LLC (collectively, “C-L”), appeal from a trial court judgment granting the plaintiff, Phillips Energy Partners, LLC (“PEP”), a right of passage across their estates and denying the defendants’ motion for new trial. For the following reasons, we affirm in part and reverse in part the trial court judgment and remand for further proceedings.
FACTS
In May 2008, PEP purchased a 160-acre tract in DeSoto Parish for mineral development. The property is an enclosed estate with no access to a public road. Donald Warren Crow controls the Milton Crow Partnership with his three sisters. Livingstone, LLC, is controlled by Crow’s brother-in-law, Will Livingstone. C-L owns a 1,100 acre tract, used as a timber plantation, to the west of the PEP property. There is a house on the property, but neither the Crows nor the Livingstones live on the tract.
Chesapeake Energy (“Chesapeake”) drilled several gas wells on the C-L and PEP properties with plans to drill additional wells. In order to access the wells on both properties, Chesapeake entered into an agreement with C-L for a road through the middle of their property to connect with the Keithville-Keatchie Road, which is a public road.[1] C-L directed *431 where the Chesapeake road would be located. This road also extended onto the PEP property.
|2PEP dug several ponds on its land in order to sell water for hydraulic fracturing. This work cost more than $900,000. The workers used the Chesapeake road to access the PEP property, until C-L objected in late 2010 or early 2011. Landowners who live on the property to the east allowed PEP to construct a temporary road to complete the project. However, they did not want PEP to have a permanent road through their land, where they lived and which would connect with streets in a residential subdivision. Efforts by PEP to obtain a contractual right of passage agreement across the property of CL were unsuccessful.
On July 14, 2011, PEP filed suit against C-L to obtain a right of passage, preferably over the Chesapeake road. PEP claimed a right of passage over C-L’s property to the nearest public road. In its answer, C-L claimed that the nearest public road was to the east, and PEP was not entitled to claim a right of passage over the C-L property. C-L also claimed that no “exceptional circumstances” existed to support a right of passage over its property. In response to C-L’s position, PEP amended the petition to add all the property owners to the east, north, and northwest.[2] PEP alleged that the property to the east frequently flooded and constituted wetland under federal law and again sought a right of passage over the C-L property. The various additional defendants filed answers objecting to a road over their properties and basically aligned themselves with PEP.
|sThe case was tried May 28-29, 2013. The parties agreed that the ability of PEP to pay for a road was not an issue. Other stipulations included the facts that Rosemary Lane is a public road, the PEP tract is land-locked, and the PEP tract did not become enclosed as a result of a voluntary act or omission of PEP or its ancestors-in-title.[3] The evidence focused on three proposed routes. (See the attached exhibit.) Route One, marked in red on the exhibit, on property to the east, connects to Rosemary Lane, a public road. This was the shortest route. Route Two, marked in blue, on C-L’s property to the west, goes along the northern border of the C-L tract before connecting with the existing Chesapeake road and ending at the Keithville-Keatchie Road. Routes One and Two would require construction of a roadway. Route Three, marked in green, is the existing Chesapeake road. PEP’s first choice was Route Three. The landowners to the east opposed Route One. C-L, of course, opposed both Routes Two and Three and maintained that the law dictated that the right of passage must be located on the shortest route to a public road. *432 Needless to say, this was a hotly contested trial. Pre-trial and post-trial briefs were filed and the matter was taken under advisement by the trial court.
On September 10, 2013, the trial court issued a written ruling establishing the right of passage on Route Three. The court found that environmental and economic issues associated with Routes One and Two disqualified them from consideration. It found that Route Three was already on an established road and was the least injurious of the proposed routes.
|4C-L filed a motion for further proceedings, which was summarily denied, urging that several issues were not addressed in the ruling. On December 30, 2013, the trial court signed a judgment, prepared by PEP, granting PEP a right of gratuitous passage along Route Three. All claims against the other defendants who owned property near the PEP tract were dismissed with prejudice. C-L then filed a motion for new trial, claiming that the judgment was not provided to their attorney prior to submission to the court, was contrary to the law and evidence, and contained numerous form and substance issues.
On March 10, 2014, a hearing was held on the motion for new trial. The judgment contained what purported to be the legal description of the servitude area. The trial court agreed to correct the legal description of the servitude. The parties and the court also agreed to delete the word “gratuitous” regarding the servitude.[4] C-L contended that La. C.C. art. 689 requires the owner of the enclosed estate to indemnify the owner of the ser-vient estate for damages associated with the right of passage. It requested that the trial court consider that issue. The trial court found that the issue of damages had not been previously raised and there was nothing in the record to consider. The court opined that the issue was more properly the subject of a separate lawsuit.
On June 9, 2014, the trial court signed an amended judgment deleting the word “gratuitous” and including an amended legal description of the servitude. The motion for new trial was otherwise denied. C-L appealed.
|aSERVITUDE OF PASSAGE
C-L raises several assignments of error objecting to the placement of the servitude of passage on its property at the location of Route Three. C-L contends that the trial court erred in its findings that the CL tract owed the PEP property a right of passage and that exceptional circumstances existed permitting deviation from the “shortest route” rule. C-L maintains that the trial court should not have considered the cost of constructing a road on Route One since PEP agreed prior to trial that ability to pay would not be at issue. C-L also asserts that the trial court erred in considering convenience to PEP and which route would be least injurious in determining which estate owed the servitude of passage.
Standard of Review
C-L claims that the trial court erred in its application of the law to such an extent that the manifest error standard of review is no longer applicable and this court should conduct a de novo review. We reject this argument and find that the manifest error standard of review is applicable. C-L’s argument is that the trial court committed legal error when it did not locate the servitude on the shortest route. As explained below, some situa *433 tions present exceptional circumstances warranting a deviation from the general rule. Although C-L may disagree with the outcome of the suit, we find no misapplication of the law by the trial court.
The trial court’s factual findings are subject to reversal only if the appellate court finds that no reasonable factual basis exists for the findings of fact and determines that the record establishes that the trial court’s findings are manifestly erroneous or clearly wrong. Stobart v. State, Through Dept. of Transp. & Dev., 617 So.2d 880 (La.1993); Dickerson v. Coon, 46,423 (La.App.2d Cir.8/10/11), 71 So.3d 1135. The appellate court does not determine whether the trier of fact was right or wrong. Rather, the issue to be resolved is whether the trier of fact’s conclusions are reasonable based on a review of the entire record. If the trier of fact’s findings are reasonable in light of the record reviewed in its entirety, then reversal is not warranted. This is - so even if the appellate court, sitting as the trier of fact, would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Stobart, supra; Dickerson v. Coon, supra.
Location of Servitude
C-L contends that the trial court erred in granting PEP a right of passage over its property on Route Three. C-L argues that the trial court was first required to determine which estate owed the servitude by determining the shortest route to the nearest public road. C-L maintains there were no exceptional circumstances permitting a deviation from the “shortest route” rule and that the trial court erred in considering convenience to PEP and which route would be least injurious in determining which estate owed the servitude of passage.
The owner of an estate that has no access to a public road may claim a right of passage over neighboring property to the nearest public road. He is bound to indemnify his neighbor for the damage he may occasion. La. C.C. |7art. 689.[5] The right of passage for the benefit of an enclosed estate shall be suitable for the kind of traffic that is reasonably necessary for the use of that estate. La. C.C. art. 690. The owner of the enclosed estate may construct on the right of way the type of road or railroad reasonably necessary for the exercise of the servitude. La. C.C. art. 691. The owner of the enclosed estate may not demand the right of passage anywhere he chooses. The passage generally shall be taken along the shortest route from the enclosed estate to the public road at the location least injurious to the intervening lands. La. C.C. art. 692.
The general rule of La. C.C. art. 692 is that the estate providing the shortest route to the nearest public road must provide the right of passage. As recognized by the legislature in its use of the word “generally” in La. C.C. art. 692, there are situations that allow the servitude of passage to be imposed on an estate that does not provide the shortest route. Davis v. Culpepper, 34,736 (La.App.2d Cir.7/11/01), 794 So.2d 68, writ denied, 2001-2573 (La.12/14/01), 804 So.2d 646. See also Mitcham v. Birdsong, 573 So.2d 1294 (La.App. 2d Cir.1991); Morgan v. Culpepper, 324 So.2d 598 (La.App. 2d Cir.1975), writs denied, 326 So.2d 377, 378 (La.1976). The first exception recognized by the jurisprudence is when the estate *434 which provides the shortest route is covered by water or is otherwise not accessible year-round. The second derogation from the general rule is when the costs associated with crossing the estate which is the shortest distance from the public road are so exceptional that from a practical standpoint it is | seconomically unfeasible to build. The party arguing that the servitude should instead be imposed on another estate bears the burden of establishing that one of the two exceptions is applicable. Davis v. Culpepper, supra. Departure from the general rule requiring location of the right of passage along the shortest route must be supported by weighty considerations. Dickerson v. Coon, supra.
Trial Testimony
The trial court heard testimony from numerous lay and expert witnesses. Voluminous exhibits were introduced into evidence. The evidence supports the ruling made by the trial court.
, Cynthia Lacaze Gilcrease[6] lives to the east of the PEP tract and has a long driveway to her house. Her former in-laws have a house nearby. For ingress and egress to her house, she drives down her driveway to Rosemary Lane, which goes through the Collinswood residential neighborhood. In December 2010, she allowed people doing work for PEP to bulldoze a temporary access from her driveway to the PEP property. She told them she did not want 18-wheelers passing on the road and did not want her driveway torn up. Permission to use the temporary road was to last only a few months. Ms. Gilcrease stated that a creek ran through the temporary access and it was frequently muddy and impassable. She took a number of photographs of the area which were introduced into evidence. They showed the condition of Route One after a moderate rainfall. The photos show that a | cisizable creek runs through the area with copious amounts of water drainage.
Danny Ray Gilcrease, Ms. Gilcrease’s former husband, owns property to the east of the PEP tract, where his parents live. A major creek flows through his property in the area of Route One that connects to a tributary which flows to the border between Caddo and DeSoto Parishes. He stated the area drains four or five sections of land. At one point, Mr. Gilcrease put a deer feeder in the low-lying area about 150 yards from Ms. Gilcrease’s house, in the direction of the PEP property. Water rose so high that it tipped over the feeder, which was loaded with 150 pounds of corn. Mr. Gilcrease stated that the area was so muddy he had to use a four-wheeler to get to that location. When it rains 3-5 inches, the property is frequently under five feet of water. He stated that a permanent road on Route One would increase the flooding on his land. He expressed concerns about traffic and said that Chesapeake did not put its road at that location due to opposition from residents in the nearby Collinswood subdivision. Mr. Gil-crease had considered subdividing his property, and had offered to sell 14 acres to PEP for $225,000. This price was to compensate for profits he would not receive by subdividing the land. Mr. Gil-crease stated that he would not participate in obtaining a federal wetland mitigation permit for building a road through his property.
Christopher Phillips is president of PEP. The company was formed in 2007, and is a mineral and royalty acquisition fund backed by a private equity firm in *435 Houston, Texas. PEP sent a letter to C-L asking for a permanent road use agreement for the Chesapeake road. Mr. Crow was 110concerned about liability issues and denied access. At that point, PEP constructed the temporary road through Ms. Gilcrease’s property, but never intended it to be permanent. He claimed that large trucks cannot get through on the temporary road.
Oliver Jenkins, executive vice-president of PEP, oversaw the construction of the ponds on the property. When C-L objected to use of the Chesapeake road, a temporary access road was constructed on Ms. Gilcrease’s property, the site of proposed Route One. According to Mr. Jenkins, Route One, to the east, would pass through a residential area and would not be particularly well-received by the people in the area. He had obtained an estimate of $171,440.00 for building a road through that area.
Steve Wayne Brown, parish engineer for the DeSoto Parish Police Jury, testified that Route One would create concerns about traffic through a'residential area. If there are alternate routes, the parish will not allow commercial traffic to pass through a residential neighborhood. He said there is a possibility that the police jury could deny a road use permit and there was no guarantee that the road would be accepted into the parish road system. However, if PEP built a private road to Rosemary Lane, it would not have to go through the parish planning commission.
Christopher Fetters, a registered professional engineer and senior project manager with Conestoga-Rovers & Associates, had previously worked with the U.S. Army Corps of Engineers. He had done work in the delineation and scope of wetlands and determining what requirements would have to be met to obtain a permit from the federal government to build a road in the wetland area. He was accepted as an expert in environmental |,, engineering. Mr. Fetters had been to the PEP tract about 12 times. He used the temporary road in the vicinity of Route One and found it to be very muddy and difficult to traverse and not suitable for car traffic. He sent two wetlands specialists to evaluate the PEP property. The evaluation included numerous factors, including soil samples. The soil, on Route One was “hy-dric,” meaning that it is typically inundated with water and rarely dries out. The presence of hydric soil is indicative of wetland. Vegetation and water marks on trees also showed that the area was wetland. The area drains into Brushy Bayou, which drains into Bayou Pierre, and then into the Red River. The area has sheet water flow during rains and is prone to flash flooding. Mr. Fetters defined “sheet flow” as follows:
Sheet flow is a terminology that we use when you have a large volume of water that varies in depth that crosses a broad expansive area, similar to this area east of the Phillips property. It’s very wide, so when the water comes through it’s not as channelized as it is. You know, so once this-once the water reaches the bounds of the creek it then essentially, you know, fills in the flood flight and so it looks like a sheet of water going across a very large area, flash flood is really what it is.
Building a road on this route would require federal wetland mitigation which would cost a significant amount, in addition to construction costs, and would require obtaining a government permit. Mr. Fetters stated that the road would be 1,000 feet long and a 50-foot wide clearance would be necessary to maintain drainage. This would impact more than one acre of wetland and a federal permit would be *436 required. There was no guarantee that a permit would be granted, and, if it was, mitigation offset fees would have to be paid. He estimated these fees would be $60,000 to $80,000.
[ 12Mr. Fetters testified that federal permits were not required for construction of a temporary road because it would not have a permanent impact on the area. Also, no permits were necessary for the construction of ponds because .they were regarded as flood control structures.
Carrie Ferguson Salinas testified on behalf of C-L. She claimed to be an expert in environmental matters, and did wetland delineations. She never worked for the U.S. Army Corps of Engineers and was not a registered professional engineer or environmental engineer. She was a registered geologist in Texas. Ms. Salinas has a storm water certification which was obtained after a one-day seminar by the Louisiana Association of Contractors. She did not do a formal wetland delineation or analysis on the routes involved here, but did go to the area and looked at Route One. She calculated that the road would be 1,000 feet long with a clearance 20 feet wide.[7] She opined that not all of Route One is wetland. She felt that construction of a road on Route One would impact less than one-half acre, negating the necessity for a government permit. In answer to questioning by the trial court, if a permit was necessary, Ms. Salinas said it would take 80-60 days to obtain it. However, she acknowledged that PEP would have difficulty obtaining a permit when it does not own the land. Ms. Salinas felt certain the U.S. Army Corps of Engineers would allow a road to be built on Route One.
James Donald Mohr, an expert in civil engineering, examined the area to the east of the PEP tract. Although called by CL, he candidly [ ^acknowledged that Route One would be difficult to construct because of the creek in that area and it would require the issuance of a government permit.
Donald Crow testified that the C-L land is primarily used as a timber plantation. C-L had granted hunting leases to a group of bow hunters. There is a gate on the Keithville-Keatchie Road where the Chesapeake road begins that is kept locked.[8] Mr. Crow expressed concerns with the liability that might arise from people passing through their land. There were also issues with gates being left open. Mr. Crow felt the owners would lose total control of who went through the property if the right of passage was established on the Chesapeake road. However, it is interesting that Mr. Crow also testified that PEP already has the right to use the Chesapeake road to transport water, as a subcontractor of Chesapeake, but it did not have the right to use it for any other purpose.
Michael Estess, an excavation contractor who owns Landworx Construction, built the temporary road on Route One. His company also built the ponds on PEP property. He provided an estimate of approximately $170,000 for constructing a permanent road at that location.
' As stated above, La. C.C. art. 692 provides that the right of passage generally shall be taken along the shortest route from the enclosed estate to the public road. Situations which allow the right of passage to be placed on an estate that does *437 not provide the shortest route include routes which are covered with water or are otherwise not accessible year-round and where costs associated with crossing the estate with the shortest route are so | ^exceptional that it is economically unfeasible to build.[9] The parties here agreed that PEP’s ability to pay for the cost of constructing a road for exercising the right of passage is not an issue in this case.[10] Therefore, limited to the circumstances of this case, any consideration of cost in determining which estate is burdened with the servitude was arguably not proper.
While Route One is the shortest route to the nearest public road, even discounting the cost exception, the record supports the trial court finding that PEP proved the “weighty considerations” necessary to place the servitude of passage on another estate. C-L argues that the temporary road in this area was used for approximately one year, demonstrating that the route was accessible year-round. It is not clear whether the road was used continuously for one year. At trial, it was shown that Route One crosses a creek bed and large amounts of water drain across that location during moderate rainfall. Photographs in the record documented the large amount of water flowing through the area and the damage done to the temporary route, a portion of which was washed out. Ms. Gilcrease testified there were 11Rtimes she denied PEP access to the temporary route because it was too muddy. Although there was no official designation from the federal government, there was credible testimony and evidence to show that Route One was in an area that would meet the federal definition for wetlands and would require a federal permit for construction of the road. There was no guarantee that a permit could be obtained.[11] There was also testimony that a road at that location would be difficult to construct.
The trial court was presented with conflicting testimony on the issue of whether Route One was covered with water and whether it was accessible year-round. The trial court’s determination that environmental factors present in this case constituted an exception to the “shortest route” rule under La. C.C. art. 692, precluding *438 placement of the servitude of passage on Route One, was reasonable in light of a review of the entire record. The trial court’s finding in this regard was not manifestly erroneous or clearly wrong.
Since the trial court determined that the servitude of passage should not be placed on Route One, it was then required to determine whether Route Two or Route Three should be selected. Upon determining which estate will be burdened with the right of passage, courts usually engage in a balancing test to determine where on the servient estate the right of passage should be located. Dickerson v. Coon, supra. The circumstances of each case will determine the location of the servitude. Anderton v. Akin, 493 So.2d 795 (La.App. 2d Cir.1986), writ denied, 497 So.2d 1014 (La.1986).
| , (¡While courts will normally grant a right of passage that is least injurious to the servient estate, other factors, such as distance, degree of injury to the servient estate, practicability, and cost, weigh in the decision of where to locate the right of passage. Instruction on fixing the right of passage is found in Anderton v. Akin, supra, which explains that, while the right of passage should be fixed at the point least injurious to the servient estate, the matter of its location is not to be left to the caprice or option of the party who must grant the servitude. The court must also be mindful of the rights that the law affords the dominant estate owner. As such, a right of passage that is extremely circuitous, impracticable, and expensive should not be selected because it is less burdensome to the servient estate owner. See Dickerson v. Coon, supra. See also A. Yiannopoulos, Predial Servitudes § 5:14 in 4 La. Civil Law Treatise (4th Ed.2013).
The record shows that, if the servitude were placed on its property, C-L favored placing the servitude on Route Two. Mr. Crow said that Route Two would benefit C-L because it would not pass through the middle of the property, it would result in marking the northern boundary, and would give C-L new fences in that area. This route would require new construction.
Mr. Phillips examined that route, but found that it was heavily wooded, with a steep drop-off and a creek bed. Mr. Phillips failed to see how Route Two would avoid the liability issues claimed by Mr. Crow. According to Mr. Phillips, Route Three, which is the Chesapeake road, is already designed for oil and gas traffic. The traffic added by PEP would not substantially change or add to the traffic already existing on the Chesapeake road.
117Mr. Jenkins also examined Route Two and found that it was wooded for 1,500 to 2,000 feet and then had a 30-foot drop-off. There had been enough water flowing through the area to take down trees. Mr. Jenkins stated that he could not see an advantage for any of the parties in using Route Two and was of the view that Route Two wquld cause additional damage to the C-L property.
Mr. Fetters walked the area proposed for Route Two and found low-lying areas with seasonal water flow. Constructing a road on Route Two would alter the natural flow and drainage of the water. According to Mr. Fetters, a road at that location would cause safety and maintenance issues due to the amount of water flowing through the area. He said that placing a road on Route Two would cause flooding where there is none now. Mr. Fetters said that Route Three, which already exists, is the least injurious.
After hearing the testimony and reviewing the evidence, the trial court determined that placing the right of passage on Route Three would be the least injurious *439 to the C-L estate.[12] Based upon our review of the record, we find that the trial court was not manifestly erroneous or clearly wrong in its finding under the unique and special circumstances presented by this case.
NEW TRIAL
C-L argues that the trial court erred in denying its motion for further proceedings and new trial once it determined that the servitude of passage would traverse the CL property. According to C-L, the judgment failed to consider the issue of damages or to reserve C-L’s right to establish damages | lsoccasioned by the granting of the servitude. Also, the judgment failed to provide for PEP’s obligation to keep the gates on Route Three locked or address liability and expense issues.
Legal Principles
A new trial may be granted, upon contradictory motion of any party or by the court on its own motion, to all or any of the parties and on all or part of the issues, or for reargument only. If a new trial is granted as to less than all parties or issues, the judgment may be held in abeyance as to all parties and issues. La. C.C.P. art. 1971. A new -trial shall be granted, upon contradictory motion of any party, when the verdict or judgment appears clearly contrary to the law and the evidence. La. C.C.P. art. 1972(1). A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law. La. C.C.P. art. 1973. Although the granting or denying a motion for new trial rests within the trial court’s wide discretion, the court cannot set aside a judgment if it is supportable by any fair interpretation of the evidence. Cash Point Plantation Equestrian Ctr., Inc. v. Shelton, supra.
As stated above, at the time this suit was filed, La. C.C. art. 689 provided that the owner of an enclosed estate who seeks a right of passage over neighboring property is bound to indemnify his neighbor for the damage he may occasion. The indemnity is for the “damage” caused to the servient estate. That measure is different from compensation due to a landowner for the expropriation of servitude of passage. The amount of the indemnity is fixed in light of the damage occasioned to the ser-vient estate. |19See A. Yiannopoulos, Pred-ial Servitudes § 5:15 in 4 La. Civil Law Treatise (4th Ed.2013).
Any plaintiff demanding a legal right of passage under La. C.C. art. 689 must allege that he is willing to pay compensation for the damages occasioned by the servitude. Elston v. Montgomery, 46,262 (La.App.2d Cir.5/18/11), 70 So.3d 824, writ denied, 2011-1292 (La.9/23/11), 69 So.3d 1165; Morgan v. Culpepper, supra. By filing suit for right of passage, a party effectively alleges willingness to indemnify the owner of the servient estate for the damages resulting from use of the servitude. There is no need for the owner of the servient estate to demand payment of indemnification that was already admitted. See Elston v. Montgomery, supra. However, the burden is on the owner of the servient estate to prove the amount of damage resulting from the servitude of passage. Dickerson v. Coon, supra.
Discussion
The record shows that C-L repeatedly attempted to raise the issue of damages at trial, but was precluded from doing so by the trial court. The record *440 reflects that Mr. Crow expressed concerns about liability and maintaining control of the traffic passing through his land. He was questioned by his attorney regarding when he discovered that PEP was using the Chesapeake Road and the extent of that use, presumably in order to establish damages. He was cut off by the trial court. After the trial court determined that the right of servitude would be imposed on Route Three, C-L filed a motion for further proceedings or new trial, urging several issues, including consideration of damages and imposing restrictions on the use of the servitude. These arguments were rejected by the trial court.
120As explained earlier, the trial court had mistakenly granted a gratuitous servitude of passage in the original judgment. All parties admitted this was erroneous and it was deleted from the amended judgment. Because the servitude was not gratuitous, and under La. C.C. art. 689 damages might be owed to C-L, at the hearing on the motion for new trial, C-L raised that issue. The trial court again denied C-L an opportunity to establish damages, reasoning that the issue had not been raised at trial. The following exchange took place:
[C-L’S ATTORNEY]: If I could remind The Court, during the trial when Mr. Crow was testifying, you asked us — we were beginning to go into the history of the Phillips’ illegal use of the road. You said this has nothing to do with choosing a route. I really don’t want to hear this now. And so we took that to mean you wanted to choose the route—
[THE COURT]: Right.
[C-L’S ATTORNEY]: — and then only if we were the route that you chose, because we had five or six different defendants,, then we would bring up the issue of what sort of damages and what other issues there may be.
The court denied the motion for new trial, concluding that damages were an issue for a “different day.” The trial court stated that C-L would have to file a separate lawsuit to recover damages and the issue would not be res judicata.[13]
As set forth above, C-L was not required to plead entitlement to damages and the trial court precluded it from presenting proof on this issue at trial. Also on the motion for new trial, C-L sought to have the trial court consider whether restrictions should be placed on the servitude. Restrictions Li on the use of a servitude, such as requiring gates across the path, may be imposed in establishing the right of passage. See Pittman v. Marshall, 104 So.2d 230 (La.App. 2d Cir.1958); Elston v. Montgomery, supra. We find that the trial court erred in failing to consider the issue of damages and any restrictions that should be placed on the use of the servitude. Therefore, we reverse that portion of the trial court judgment denying the motion for new trial and remand the case to the trial court for further proceedings consistent with this opinion.
CONCLUSION
For the reasons set forth above, we affirm that portion of the trial court judgment awarding the plaintiff, Phillips Energy Partners, LLC, a right of passage across the land of Milton Crow Limited Partnership and Livingstone, LLC, at the location of the existing Chesapeake road, and dismissing with prejudice all claims against the other defendants. We reverse that portion of the trial court judgment denying the motion for new trial on the issue of damages and restrictions on the use of the servitude. We remand the mat *441 ter to the trial court for further proceedings. Costs in this court are assessed one-half to Phillips Energy Partners, LLC, and one-half to Milton Crow Limited Partnership and Livingstone, LLC.
AFFIRMED IN PART; REVERSED IN PART; REMANDED.
—^
[[Image here]]
*442 APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, DREW, LOLLEY, and GARRETT, JJ.
Rehearing denied.

. The first surface easement to Chesapeake by C-L was executed on July 14, 2008, granting an unrestricted easement over C-L land for all operations on the land reasonable and necessary in connection with drilling, completion, and maintenance of wells. This included the right of ingress and egress to C-L land. On February 17, 2010, C-L entered into a subsequent agreement with Chesapeake entitled "Road Use Agreement And Grant Of Surface Servitude And/Or Easement.” This included a plat of the access road and granted an unrestricted easement for the access road for ingress and egress to wells for drilling, completion,, production, and maintenance of wells. Surface owners were granted the right *431 to use the access road as long as they did not interfere with Chesapeake’s rights. Chesapeake was obligated to maintain the road in good working condition during the entire term of the agreement and was obligated to erect gates at specified points and to keep the gates locked when the road was not in use.

. The defendants added to the petition were: Danny Ray Gilcrease; CPS Timberlands, LLC; Cynthia Ann Gilcrease Lacaze; Mark Aaron Pendleton and Jessica T. Pendleton; Hill Investments Limited'; Six-J, Inc.; Harris Taylor Burford III and Brenda Ann Thames Burford; Charles Kenneth Gray, Jr. and Carol Boyett Gray; William C. Dean and Juanita Dean; James Edward Tipton; Dennis Scott Collier and Chelsey Paige Collier; Stewart Wayne Knighten and Terry P. Knighten.

. Early in the development of this litigation, it appeared that there was a public road on C-L property. However, at trial the parties stipulated that the road identified on Google Maps as "Parish Road 647” is actually not a parish road.

. The servitude would be gratuitous- only if the' requirements of La. C.C. art. 694 were met. Those factors are not present in this case.

. In the petition, Ms. Gilcrease’s name is listed as Cynthia Ann Gilcrease Lacaze. At trial, she stated her name is Cynthia Lacaze Gil-crease.

. Mr. Fetters testified that the required clearance would be 50 feet.

. Pictures of the entrance were .introduced into evidence. A sign on the gate reads: "Private Road — only Bayou Bend Joint Ventures, Chesapeake Energy and their employees and vendors are authorized to use this road.”

. Numerous cases from other circuits have noted that, generally, the right of passage shall be taken along the shortest route from the enclosed estate to the public road, but other factors must be considered. See Brown v. Terry, 103 So.2d 541 (La.App. 1st Cir.1958); Tessier v. Med. Ctr. of Baton Rouge, Inc., 93-0075 (La.App. 1st Cir.3/11/94), 636 So.2d 928, writ denied, 1994-1609 (La.9/30/94), 642 So.2d 878; Watts v. Baldwin, 95-0260 (La.App. 1st Cir.10/6/95), 662 So.2d 519; Bouser v. Morgan, 520 So.2d 937 (La.App. 3d Cir. 1987); Pearson v. Theriot, 534 So.2d 35 (La.App. 3d Cir.1988); Braxton v. Guillory, 98-379 (La.App. 3d Cir.10/28/98), 721 So.2d 114; Bailey v. McNeely, 2005-629 (La.App. 3d Cir. 12/30/05), 918 So.2d 1124; May v. Miller, 2006-418 (La.App. 3d Cir. 10/11/06), 941 So.2d 661, writ denied, 2007-0009 (La.3/9/07), 949 So.2d 443.

. C-L cites Cash Point Plantation Equestrian Ctr., Inc. v. Shelton, 40,647 (La.App.2d Cir. 1/25/06), 920 So.2d 974, and Davis v. Culpepper, supra, in arguing that the cost of constructing a road on Route One should not have been considered in this case. Cash Point and Davis basically held that the owner of the enclosed estate failed to prove that the construction of a road on the route ordered by the court was cost-prohibitive. In this case, the parties stipulated that ability to pay was not a factor. C-L also cites Mitcham v. Birdsong, supra, which is factually and procedurally distinguishable from the present case.

.See Pearson v. Theriot, supra, in which the shortest route to the nearest public road required construction of a bridge over a canal which required permits. One of the factors in rejecting the shortest route was the necessity for obtaining the permits and the fact there was no guarantee that the permits could be obtained from the appropriate authority.

. The record shows that when C-L and Chesapeake entered into the agreements for this road, the rather circuitous route was determined by C-L. In addition to Chesapeake and its subcontractors (including PEP), the road also is used by loggers and hunters.

. We note that, in questioning at oral argument, the attorney for PEP conceded that consideration of damages would not be barred by res judicata.